*Mobil Cerro Negro, Ltd., et al. v. Bolivarian Republic of Venezuela*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: January 7, 2016      Decided:  July 11, 2017)

[Last submissions: May 23, 2016]

Docket No. 15-707

MOBIL CERRO NEGRO, LIMITED, VENEZUELA HOLDINGS, B.V., MOBIL CERRO NEGRO HOLDING, LIMITED, MOBIL VENEZOLANA DE PETROLEOS HOLDINGS, INCORPORATED, MOBIL VENEZOLANA DE PETROLEOS, INCORPORATED,

*Arbitration Award Creditors–Petitioners-Appellees*,

–v.–

BOLIVARIAN REPUBLIC OF VENEZUELA,

*Arbitration Award Debtor–Respondent-Appellant.*

B e f o r e :

POOLER, HALL, and CARNEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the Southern District of New York (Engelmayer, *J.*), denying a motion to vacate the judgment entered against the Bolivarian Republic of Venezuela on an award made by an arbitral panel of the International Centre for Settlement of Investment Disputes ("ICSID") in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention"). The District Court relied on 22 U.S.C. § 1650a ( "Section 1650a"), the statute enabling U.S. participation in the ICSID

Convention, and certain exceptions set forth in the Foreign Sovereign Immunities Act ("FSIA"), in exercising jurisdiction over the creditors' action against Venezuela. The District Court concluded that the procedure by which the creditors obtained the judgment—filing an *ex parte* petition for "recognition" in accordance with New York state law, N.Y. CPLR Art. 54—was appropriate in light of a perceived procedural "gap" in Section 1650a. Compliance with the FSIA's service of process and venue provisions was unnecessary, the District Court ruled, determining that to inject state processes into Section 1650a was more consistent with the ICSID Convention's goal of affording streamlined enforcement proceedings than would be applying the FSIA's provisions.

We conclude that the District Court erred. We reject the proposition that Section 1650a provides an independent grant of subject matter jurisdiction and hold that the FSIA provides the sole basis for federal court jurisdiction over foreign sovereigns in actions to enforce ICSID awards. Because the FSIA, not Section 1650a, governs these proceedings, the procedural requirements set forth in the FSIA's comprehensive scheme must be satisfied before a federal court may enter judgment against a foreign sovereign. These requirements were not met here. We therefore REVERSE the order denying respondent's motion, VACATE the judgment, and REMAND the cause with instructions to dismiss the *ex parte* petition.

REVERSED, VACATED, AND REMANDED.

⸻

JOSEPH D. PIZZURRO (Kevin A. Meehan, Juan O. Perla, Joseph B. Heath, *on the brief*), Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, New York, *for Respondent-Appellant*.

STEVEN K. DAVIDSON (Michael J. Baratz, Bruce C. Bishop, Jared R. Butcher, Molly Bruder Fox, *on the brief*), Steptoe & Johnson LLP, Washington, D.C., *for Petitioners-Appellees*.

Jennifer Jude, Benjamin H. Torrance, Christopher Connolly, Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Sharon Swingle, Civil Division, Department of Justice, Brian Egan, Legal Adviser, Department of State, Washington, D.C., *for amicus curiae United States of America*.

⸻

SUSAN L. CARNEY, *Circuit Judge*:

This case requires us to examine the authority of a United States district court to adjudicate an arbitral award-creditor's *ex parte* petition for entry of a federal judgment against a foreign sovereign premised on an award made under the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention" or "Convention"). The award in this case arose from a dispute submitted to the International Centre for the Settlement of Investment Disputes by certain subsidiaries of ExxonMobil Corporation (collectively, "Mobil") and the Bolivarian Republic of Venezuela ("Venezuela"). Directing Venezuela to pay Mobil approximately $1.6 billion, the award was announced on October 9, 2014 (the "Award"). The following day, Mobil filed an *ex parte* petition asking the U.S. District Court for the Southern District of New York to recognize the Award and to enter judgment based on it. The Motion Term Part I judge granted the petition and entered judgment in the full amount awarded by the ICSID panel.

Venezuela learned of the judgment's entry by letter delivered electronically to its legal counsel soon after the court's action and promptly moved under Federal Rule of Civil Procedure 60(b) to vacate the judgment for both lack of subject matter and personal jurisdiction. The District Court judge subsequently assigned to the case denied the motion, concluding that it had subject matter jurisdiction under certain exceptions

3

to sovereign immunity recognized in one provision of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1605, and in 22 U.S.C. § 1650a ("Section 1650a"), the statute enabling U.S. participation in the ICSID Convention. *See Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela* ("*Mobil Cerro Negro*"), 87 F. Supp. 3d 573, 587-90 (S.D.N.Y. 2015). The *ex parte* procedures—which did not satisfy the FSIA's requirements for personal jurisdiction—were sufficient, the District Court reasoned, because a procedural "gap" in Section 1650a permitted courts to take guidance from New York state law. *Id.* at 583-86. Accordingly, it turned to the summary procedures for recognizing and enforcing "foreign judgments" that are set forth in New York Civil Practice Law and Rules ("N.Y. CPLR") Article 54. *Id.* at 584. The District Court disclaimed any need to obtain personal jurisdiction over Venezuela under the FSIA, in light of Venezuela's participation in the Convention and the permission given by N.Y. CPLR Article 54 for New York state courts to enter "foreign judgments" even absent jurisdiction over the judgment debtor. *Id.* at 590-602.

We conclude that the District Court erred in declining to vacate the judgment. We reject Mobil's argument that Section 1650a provides an independent grant of subject-matter jurisdiction for actions against foreign sovereigns and decide that the FSIA provides the sole basis for subject-matter jurisdiction over actions to enforce ICSID awards against a foreign sovereign. Because actions to enforce ICSID awards against a

4

foreign sovereign fall within the FSIA's comprehensive scheme, plaintiffs pursuing such actions must satisfy the FSIA's procedural requirements. The District Court was therefore mistaken in excusing Mobil from complying with the FSIA's service and venue requirements. The *ex parte* proceedings that Mobil utilized are neither permitted by the FSIA nor required by Section 1650a. The FSIA's procedural requirements regarding notice and venue serve Congress's stated goals of promoting comity with other sovereigns and ensuring the United States' consistency of approach with respect to federal courts' interactions with foreign sovereigns. The ICSID Convention's significant, but more modest, aims of allowing streamlined enforcement of authenticated ICSID arbitral awards and restricting substantive appeals of those awards to ICSID pose no significant conflict with the FSIA and can readily be accommodated by the FSIA's comprehensive regime.

Although several courts of the Southern District of New York (the "Southern District") have from time to time allowed such *ex parte* proceedings as occurred here to provide the basis for entry of a federal judgment against a foreign sovereign, district courts in other districts have not, and have given precedence to the FSIA. We think the correct view is the latter: ICSID award-creditors must pursue federal court judgments to enforce their awards against a foreign sovereign by filing a federal action on the award against the sovereign, serving the sovereign with process in compliance with the FSIA,

5

and meeting the FSIA's venue requirements before seeking entry of a federal judgment, whether through a motion for judgment on the pleadings or for summary judgment. Those requirements were not met here. The court entering judgment needed, but lacked, personal jurisdiction over Venezuela under the FSIA.

We therefore REVERSE the District Court's order denying Venezuela's motion to vacate, VACATE the judgment entered in favor of Mobil, and REMAND the cause to the District Court with instructions to dismiss the *ex parte* petition.

## BACKGROUND

### I.   Statutory background

The present appeal requires us to harmonize the ICSID Convention and its enabling statute, 22 U.S.C. § 1650a, with the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391(f), 1441(d), 1602-1611. We therefore begin with an overview of the relevant texts, as these provide the setting for the issues presented on appeal.

### A.      *The ICSID Convention*

Between 1962 and 1965, the World Bank spearheaded development of the ICSID Convention, a multilateral treaty aimed at encouraging and facilitating private foreign investment in developing countries. *See* Anthony R. Parra, *The History of ICSID* 11-12, 24-26 (Oxford 2012) ("Parra, *History*"); *Convention on the Settlement of Investment Disputes: Hearing on H.R. 15785 before the H. Comm. on Foreign Affairs, Subcomm. on Int'l Organizations and Movements*, 89th Cong. 2-3 (1966) ("H.R. 15785 Hearing") (statement of

6

Hon. Fred B. Smith, Gen. Counsel, Dep't of Treasury) ("Smith House Statement").

According to Parra (a former ICSID Deputy Secretary-General and Legal Adviser), the "immediate origins" of the Convention stem from the period between 1955 and 1962, when the "retreat of colonialism" quickly increased the number of developing countries. Parra, *History*, at 11. The amount of governmental development assistance available for these countries fell far short of their growing economic needs, leading to a widely shared hope "that private foreign investment would become an increasingly important source of funds." *Id*. at 12. Private investors were wary of investment in these countries, however, citing risks of expropriation and other "government measures that might tend to impair the rights or assets of foreign investors." *Id*. To help allay these concerns, the World Bank was called upon to create an effective and neutral dispute settlement forum.

The ICSID Convention was the result. *See* International Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention"), Mar. 18, 1965, T.I.A.S. No. 6090, 17 U.S.T. 1270. The Convention established an international institution—the International Centre for Settlement of Investment Disputes, based in Washington, D.C. (the "Centre" or "ICSID")—under whose authority arbitration panels may be convened to adjudicate disputes between international investors and host governments in "Contracting States"—those countries

whose governments have adopted the Convention.[1] *See* ICSID Convention arts. 3, 25; *see also* Smith House Statement at 2-3. The final texts of the Convention (it has parallel versions in English, French, and Spanish) were approved by the Executive Directors of the World Bank on March 18, 1965, for submission to World Bank member governments. Parra, *History*, at 94. On June 10, 1966, the United States Congress ratified the Convention, and on October 14, 1966, after ratification by a twentieth country, the Convention officially entered into force. *See id*. at 95-97; Christopher H. Schreuer, et al., *The ICSID Convention: A Commentary* 1270 (2d ed. 2009) ("Schreuer, *Commentary*").

The Centre convenes arbitral tribunals in response to requests made by either a member state or a national of a member state. ICSID Convention arts. 36-37. At the conclusion of the proceedings, the tribunals issue written awards that address "every question submitted to the Tribunal," and "state the reasons upon which [the award] is based." *Id.* art. 48. Of particular note here, Article 53 of the Convention provides that a party dissatisfied with an award may challenge it on various grounds, but may do so only through proceedings at the Centre and not collaterally in the courts of member

---

[1] As of 2016, ICSID reported 161 signatories and 153 "Contracting States"—signatories that have ratified the Convention under the state's domestic law. *List of Member States*, ICSID.WORLDBANK.ORG, https://icsid.worldbank.org/en/Pages/icsiddocs/List-of-Member-States.aspx (last visited May 1, 2017). The term "member state" appears to be used interchangeably with "Contracting State."

states.[2] The limited role played by the member states' courts is articulated in Article 54

of the Convention, which provides that the member states agree to "recognize" ICSID

awards "as binding" and to "enforce the pecuniary obligations imposed by that

award."[3] *Id.* art. 54(1). In member states with federal constitutions, such as the United

States, ICSID awards may be enforced in a federal court: The Convention expressly

allows courts of such countries to "treat the award as if it were a final judgment of the

courts of a constituent state." *Id.* And, to enforce an ICSID award, a prevailing party

may execute on the losing party's assets with the assistance of the courts of member

---

[2] Article 53 provides, "The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention." ICSID Convention art. 53(1).

[3] The complete text of Article 54 is as follows:

(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by the award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

states in accordance with "the laws concerning the execution of judgments in force in the State in whose territories such execution is sought." *Id.* art. 54(3).

Member states' courts are thus not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award. Thus, the Convention reflects an expectation that the courts of a member nation will treat the award as final. *See* Schreuer, *Commentary*, at 1139-41 (describing principle of finality of awards and reporting that principle was the subject of "extensive discussion").

The Convention also envisions, however, that participating sovereign states remain subject to the immunity and other relevant laws of the jurisdictions in which enforcement is sought: Thus, Article 55 declares, "Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution." ICSID Convention art. 55.

### B. *The ICSID enabling statute: Section 1650a*

In August 1966, after ratifying the Convention, Congress adopted legislation to implement its provisions. Pub. L. No. 89-532, 80 Stat. 344 (1966) ("An Act [t]o facilitate the carrying out of the obligations of the United States under the Convention on the

10

Settlement of Investment Disputes Between States and Nationals of Other States, signed on August 27, 1965, and for other purposes."). As relevant here, Section 3 of the brief Convention on the Settlement of Investment Disputes Act of 1966 is codified at 22 U.S.C. § 1650a. So codified, subsection (a) of Section 1650a provides in full:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

22 U.S.C. § 1650a(a). Subsection (b) of Section 1650a gives exclusive jurisdiction over "actions and proceedings under subsection (a)" to the federal district courts, "regardless of the amount in controversy."[4]

### C. *The Foreign Sovereign Immunities Act*

The Foreign Sovereign Immunities Act of 1976, Pub. L. 94-583, 90 Stat. 2891 (1976), governs the jurisdiction of United States courts over actions against foreign sovereigns. Its enactment marked a watershed moment in the foreign relations law of the United States.

---

[4] Its full text is: "(b) Jurisdiction; amount in controversy[.] The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy."

11

As the Supreme Court described the pre-FSIA regime, "[f]or more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1982). Chief Justice Marshall's seminal opinion in *The Schooner Exchange v. McFaddon* provided the roots for the United States' embrace of the so-called "absolute theory" of sovereign immunity. *See* 7 Cranch 116 (1812). There, the Chief Justice wrote that a ship from Napoleonic France, "having entered an American port open for her reception[,] . . . must be considered as having come into the American territory, under an implied promise, that while necessarily within it, and demeaning herself in a friendly manner, she should be exempt from the jurisdiction of the country." *Id*. at 147. The "implied promise" was that a foreign sovereign would receive absolute immunity in the courts of the United States: the host sovereign "wa[i]ve[d] the exercise of a part of that complete exclusive territorial jurisdiction" to which it was otherwise entitled, because "all sovereigns impliedly engage[d] not to avail themselves of a power over their equal, which a romantic confidence in their magnanimity has placed in their hands." *Id.* at 137-38; *see* Robert B. von Mehren, *The Foreign Sovereign Immunities Act of 1976*, 17 Colum. J. Transnat'l L. 33, 35-36 & n.10 (1978) ("R. von Mehren, *FSIA*"). Despite this broad language, *The Schooner Exchange* made clear that immunity was "a matter of grace and comity," and the Court therefore continued to "defer[] to the [case-by-case]

12

decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486 (citing *Ex Parte Republic of Peru*, 318 U.S. 578 (1943), and *Mexico v. Hoffman*, 324 U.S. 30 (1945)).

In 1952, the State Department announced a change in course: it issued the "Tate Letter," a landmark policy statement expressing the Executive Branch's adoption of a more nuanced, "restrictive theory" of sovereign immunity, under which sovereigns would enjoy immunity as to their public acts, but not as to their private or commercial activities outside of their territories. *See* Ltr. from Jack B. Tate, Acting Legal Adviser, Dep't of State, to Acting Att'y Gen. Philip B. Perlman (May 19, 1952), *available at Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-15 (1976) (Appendix 2). Despite the Tate Letter's clear policy statement, however, immunity determinations continued to be made by the State Department on a case-by-case basis, at times suggesting "immunity in cases where immunity would not have been available under the restrictive theory." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004)). When the State Department did not make a suggestion as to immunity, United States courts made the determinations "by reference to prior State Department decisions." *Id.* (quoting *Verlinden*, 461 U.S. at 487); *see also* R. von Mehren, *FSIA*, at 41-42. As a result, the

13

patchwork quilt of immunity decisions continued to grow, with "sovereign immunity decisions . . . [being] made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations," resulting in standards that "were neither clear nor uniformly applied." *NML Capital, Ltd.*, 134 S. Ct. at 2255 (quoting *Verlinden*, 461 U.S. at 488) (alteration in original).

In 1976, Congress stepped in to rectify the resulting disarray by passing the Foreign Sovereign Immunities Act. In the FSIA, which is codified at 28 U.S.C. §§ 1330, 1391(f), 1441(d), and 1602-1611, Congress, "[f]or the most part," adopted the restrictive theory of foreign sovereign immunity and vested responsibility for immunity determinations in the federal judiciary. *Verlinden*, 461 U.S. at 488-89. The FSIA was designed "to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488 (quoting H.R. Rep. No. 94-1487, 1976 U.S.C.C.A.N. 6604, 6656 (1976)) (alterations in original). To this end, "the Act contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.* Congress declared categorically in the statute itself, "Claims of foreign states to immunity should henceforth be decided by courts of the

14

United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602.

The FSIA provides that, "[s]ubject to existing international agreements to which the United States is a party," foreign sovereigns "shall be immune from the jurisdiction of the courts of the United States and of the States" except as provided by one of the FSIA's exceptions to jurisdictional immunity. 28 U.S.C. § 1604; *see id.* § 1605 ("General exceptions to the jurisdictional immunity of a foreign state"). Under the FSIA, federal courts are empowered to exercise personal jurisdiction over a foreign sovereign when two conditions obtain: (1) an exception from jurisdictional immunity established by the FSIA applies, and (2) the sovereign has been served with process in accordance with the FSIA's provisions. *See* 28 U.S.C. § 1330(b); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991) ("Under the FSIA . . . personal jurisdiction [over a foreign sovereign] equals subject matter jurisdiction plus valid service of process.").[5] The procedural

---

[5] Section 1330 ("Actions against foreign states") of Title 28, enacted as a part of the FSIA, provides in full:

> (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

> (b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

requirements are set forth in 28 U.S.C. § 1608 ("Service; time to answer; default"), and the venue requirements are set forth in 28 U.S.C. § 1391(f) ("Civil actions against a foreign state").

We have held that the FSIA's immunity provisions do not shield a foreign sovereign from federal courts' exercise of jurisdiction over a civil action to enforce an ICSID award: the waiver and arbitration exceptions to immunity that are found in subsections 1605(a)(1) and (a)(6), respectively, apply, and allow such an action to proceed. *See Blue Ridge Inv., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83-85 (2d Cir. 2013) (applying FSIA exceptions to sovereign immunity to find jurisdiction over sovereign in appeal from denial of sovereign immunity in plenary action for enforcement of ICSID award). Subsection (a)(1) of Section 1605 (the "waiver exception") divests foreign sovereigns of immunity when the sovereign "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Subsection (a)(6) (the "arbitration exception") deprives the sovereign of immunity when an action is brought either "to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration" or "to confirm an award made pursuant to such

---

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

an agreement to arbitrate" if the agreement or award is subject to a treaty. *Id.*
§ 1605(a)(6).[6]

### D. *ICSID awards in federal district courts*

Nationally, district courts confronting requests to enter federal judgments upon ICSID awards against foreign sovereigns have adopted various approaches to "recognition" and "enforcement" of ICSID awards. *Compare Micula v. Government of Romania* ("*Micula I*"), 104 F. Supp. 3d 42 (D.D.C. 2015) (requiring plenary action governed by FSIA), *and Continental Casualty Co. v. Argentine Republic*, 893 F. Supp. 2d 747 (E.D. Va. 2012) (contemplating plenary action governed by FSIA), *with Mobil Cerro Negro*, 87 F. Supp. 3d 573 (S.D.N.Y. 2015) (permitting *ex parte* action), *and Siag v. Arab*

---

[6] More completely, the two relevant subsections provide:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
. . .

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, [or] (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, . . . .

17

*Republic of Egypt*, No. M-82, 2009 WL 1834562 (S.D.N.Y. June 19, 2009) (same); *see also* Viren M. Mascarenhas & Camilla Gambarini, *US Courts Adopt Different Approaches Regarding Recognition of ICSID Awards*, 20 IBA Arbitration News 37 (2015). No United States court of appeals appears to have yet given studied consideration to how ICSID awards may be converted into federal judgments and enforced in federal courts, but two distinct approaches have developed in the district courts.

The first approach permits entry of judgment on an ICSID award through *ex parte* proceedings like those at issue here. Since 1986, in the few reported opinions that have addressed the issue, district courts in the Southern District have acted on applications to enforce ICSID awards against foreign sovereigns by entering judgments *ex parte*. *See Siag*, 2009 WL 1834562; *Liberian E. Timber Corp. v. Government of Republic of Liberia* ("*LETCO*"), 650 F. Supp. 73 (S.D.N.Y. 1986); *see also Micula v. Government of Romania* ("*Micula II*"), No. 15 Misc. 107, 2015 WL 4643180 (S.D.N.Y. Aug. 5, 2015).[7] We in fact summarily affirmed one of those decisions in a non-precedential Table decision. *See LETCO*, 650 F. Supp. 73, *summarily aff'd in* 854 F.2d 1314 (2d Cir. 1987) (Table) (affirming

---

[7] Mobil draws our attention, also, to three instances—two in 2007 and one in 2011—in which federal district courts in the Southern District, sitting in Motion Term Part I, employed *ex parte* procedures to enter federal judgments on an ICSID award without reported opinion or formal objection by the foreign sovereign award-debtor. *See Grenada v. Grynberg*, No. 11 Misc. 45 (S.D.N.Y. Apr. 29, 2011); *Enron Corp. & Ponderosa Assets L.P. v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 20, 2007); *Sempra Energy Int'l v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 14, 2007); *see also Mobil Cerro Negro*, 87 F. Supp. 3d at 580 (referencing cases listed above and noting that "it appears that the award debtor did not object to the entry of any of these judgments").

18

denial of motion to vacate judgment entered *ex parte* against foreign sovereign without directly addressing propriety of using *ex parte* procedures).

The district courts adopting this approach interpret the Convention and Section 1650a to require some sort of summary procedure to recognize the ICSID award, and generally look to state law for the appropriate procedure. *But see Miminco, LLC v. Democratic Republic of Congo*, 79 F. Supp. 3d 213, 217 n.3 (D.D.C. 2015) (granting *ex parte* petition, but declining to adopt procedures for enforcing a foreign judgment from District of Columbia Code). For example, in *Siag*, the Southern District's most thorough discussion of the procedure for recognizing and enforcing ICSID awards before the District Court's opinion here, private ICSID award-creditors moved the district court to enter judgment *ex parte* on an ICSID award, having provided no advance notice of the motion to the ICSID award-debtor, the Arab Republic of Egypt. 2009 WL 1834562, at *1. Relying on the language of the ICSID Convention and Section 1650a, the *Siag* court concluded that it should "treat[] an ICSID arbitration award as [it] would the final judgment of state court," and, based on its reading of our decision in *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987), turned to New York's CPLR Article 54 to define the procedures to be employed in such a case. *Siag*, 2009 WL 1834562, at *2.

Article 54 authorizes New York state courts to enforce "foreign judgments," defined as "any judgment, decree, or order of a court of the United States or of any

19

other court which is entitled to full faith and credit in this state, except one obtained by default in appearance, or by confession of judgment." N.Y. CPLR 5401. Under these rules, a New York state court clerk may enter a judgment upon presentation of a duly authenticated "foreign judgment" and in the absence of the party as to whom the judgment applies. N.Y. CPLR 5402.[8] The creditor must, however, mail notice of filing of the judgment to the debtor within thirty days of the judgment's entry in New York, and the creditor is not permitted to obtain the proceeds of execution before thirty days after filing proof of service have passed. N.Y. CPLR 5403.[9] The *Siag* court directed the award-

---

[8] N.Y. CPLR 5402 provides:

> (a) Filing. A copy of any foreign judgment authenticated in accordance with an act of congress or the statutes of this state may be filed within ninety days of the date of authentication in the office of any county clerk of the state. The judgment creditor shall file with the judgment an affidavit stating that the judgment was not obtained by default in appearance or by confession of judgment, that it is unsatisfied in whole or in part, the amount remaining unpaid, and that its enforcement has not been stayed, and setting forth the name and last known address of the judgment debtor.

> (b) Status of foreign judgments. The clerk shall treat the foreign judgment in the same manner as a judgment of the supreme court of this state. A judgment so filed has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating, or staying as a judgment of the supreme court of this state and may be enforced or satisfied in like manner.

[9] N.Y. CPLR 5403 provides:

> Within thirty days after filing of the judgment and the affidavit, the judgment creditor shall mail notice of filing of the foreign judgment to the judgment debtor at his last known address. The proceeds of an execution shall not be distributed to the judgment creditor earlier than thirty days after filing of proof of service.

creditor to comply with these procedures, 2009 WL 1834562, at *3, and subsequent cases in the Southern District have followed its guidance.[10]

The second approach requires award-creditors to pursue a plenary action in compliance with the FSIA's personal jurisdiction, service, and venue requirements in order to enforce an ICSID award. Courts adopting this approach do not read Section 1650a to require summary enforcement and turn to the FSIA for guidance regarding how to bring an enforcement action against a foreign sovereign. *See Micula I*, 104 F. Supp. 3d 42; *Continental Casualty Co.*, 893 F. Supp. 2d 747.

In *Continental Casualty*, an ICSID award-creditor filed an action in the Eastern District of Virginia seeking recognition—but not enforcement—of an ICSID award against Argentina. 893 F. Supp. 2d at 748. Argentina moved to dismiss for lack of subject matter and personal jurisdiction and for improper venue. *Id.* At the outset, the district court concluded that Section 1650a is not "itself a grant of subject matter jurisdiction," and that the sole basis for jurisdiction over a foreign sovereign is the FSIA. *Id.* at 750. The court ruled that it had subject matter jurisdiction under the FSIA's arbitration exception to immunity, 28 U.S.C. § 1605(a)(6), and that it had personal

---

[10] The New York City Bar Association endorsed the approach adopted in *Siag* in a report issued in 2012. *See* N.Y.C. Bar, Comm. on Int'l Commercial Disputes, *Recommended Procedures for Recognition and Enforcement of International Arbitration Awards Rendered Under the ICSID Convention* 26-27 (2012). The Report explained its authors' view that this procedure would allow for "swift recognition and enforcement of ICSID awards, which is a guiding principle of the ICSID Convention," and predicted that this approach would deter attempts by award-debtors to substantively challenge the award in federal court. *See id*. at 26.

jurisdiction over Argentina because the foreign sovereign had not challenged service of process and the FSIA's service requirements had otherwise been satisfied, 28 U.S.C. § 1608. *Id.* at 751-52. But the action could not proceed, the court held, because venue did not lie in the Eastern District of Virginia; rather, the FSIA's venue provision, 28 U.S.C. § 1391(f)(4), required that the action be brought in the District of Columbia. *Id.* at 754.

The *Micula I* court adopted the approach presented in *Continental Casualty*, finding recourse to the FSIA's procedures "consistent with [the] text and structure" of Section 1650a. 104 F. Supp. 3d at 49. It phrased the question succinctly:

> Confirming, or recognizing, that arbitration award would render it an enforceable judgment of this court. . . . The question before the court is whether a statute that empowers federal courts to "enforce" an international arbitration award as if it were a final state court judgment permits a federal court, as a precursor to enforcement, to *recognize* or *confirm* such an arbitration award on an *ex parte* basis.

*Id.* at 44. Observing that Section 1650a uses only the term "enforce"— and not "recognize," "confirm," or "register," it concluded that Section 1650a does not contemplate recognition of ICSID awards as a judicial act separate from enforcement. *Id.* at 49. The plaintiff, an ICSID award-creditor, requested *ex parte* entry of judgment on its ICSID award rendered against the Government of Romania. *Id.* at 44. The court rebuffed this request, reasoning that Section 1650a "does not permit use of such an *ex parte* procedure . . . . [Micula] must file a plenary action, with proper service on the

Government of Romania under the Foreign Sovereign Immunities Act of 1976." *Id*. The court explained that, as is the case for a creditor seeking to enforce a state court judgment, the ICSID award-creditor must file a "suit on the judgment as a debt" in a "plenary proceeding" against the sovereign. *Id*. at 49 (citing *Continental Casualty*, 893 F. Supp. 2d at 754).

With these competing approaches to reconciling the ICSID Convention, Section 1650a, and the FSIA in mind, we now turn to the present controversy.

## II.  Factual background

### A.     *The underlying Award*

The parties do not dispute the basic facts giving rise to the ICSID panel's decision.

During the 1990s, Mobil (acting through the petitioner subsidiary entities)[11] invested in two oil development ventures undertaken in Venezuela: the Cerro Negro and La Ceiba projects. Cerro Negro was designed "to exploit extra-heavy crude in the Orinoco Oil Belt," and La Ceiba was designed to explore and exploit "an area with light and medium crude potential adjacent to Lake Maracaibo." Joint App'x ("J.A.") 51. Mobil pursued both investments on a joint-venture basis with the state-owned entity Petróleos de Venezuela, S.A. ("PDVSA").

---

[11] These are Mobil Cerro Negro, Ltd; Venezuela Holdings, B.V.; Mobil Cerro Negro Holding, Ltd.; Mobil Venezolana de Petróleos Holdings, Inc.; and Mobil Venezolana de Petróleos, Inc.

23

In early 2007, in conjunction with the country's nationalization of its oil industry, the Venezuelan government seized Mobil's interests in the projects. The seizures were ratified by the National Assembly of Venezuela. Following the seizures, Mobil submitted a request for arbitration to the International Centre for Settlement of Investment Disputes, seeking compensation from Venezuela for its losses from the expropriation.

Seven years later, on October 9, 2014, after lengthy arbitral proceedings in which both Mobil and Venezuela participated, a panel of ICSID arbitrators issued a unanimous award in Mobil's favor. The panel ordered Venezuela to pay Mobil approximately $1.6 billion, plus 3.25% interest compounded annually and accruing from June 27, 2007 (the date of the expropriation), until payment.[12]

### B. The ex parte petition to recognize the Award

One day after the ICSID panel announced the Award, Mobil filed an *ex parte* petition in the Southern District of New York, asking the court to "recognize" the Award "pursuant to 22 U.S.C. § 1650a," and to enter judgment directly on that Award

---

[12] The Award's text suggested the ICSID panel's willingness to allow Venezuela to offset its liability under the Award by a significant debt owed it by Mobil in connection with certain payments earlier made to Mobil by the Venezuelan governmental entity PDVSA. J.A. 162 (noting Mobil's "representation" that "in the event of a favorable award, [Mobil] [is] willing to make the required reimbursements to PDVSA" such that "[d]ouble recovery will . . . be avoided"); *see also* J.A. 264 (Venezuela's declaration citing "prior payments made to [Mobil] in February 2012 totaling US $907,581,000 in satisfaction of a separate award issued by an arbitral tribunal under the Arbitration Rules of the International Chamber of Commerce").

24

in the amount of the full $1.6 billion, plus accrued interest at the rate specified in the Award. J.A. 14-21. Mobil provided the court with a certified copy of the Award in support of its application. "*Ex parte* recognition is appropriate," Mobil explained, because "[r]ecognition of a state court judgment is a clerical function that does not require notice until after a judgment has been entered." J.A. 24. In support, it cited the ICSID Convention, Section 1650a, and N.Y. CPRL Article 54.

Sitting in the district's Motion Term Part I, a calendar established primarily for emergency and miscellaneous matters,[13] the District Court (Oetken, *J.*) granted the petition and entered judgment against Venezuela that day.

### C.     *The motion to vacate the Award*

Immediately after the judgment was entered, Mobil electronically delivered to Venezuela's legal counsel notice of the judgment together with a demand for immediate payment. Venezuela then moved to vacate the judgment. In February 2015, the District Court (Engelmayer, *J.*) denied the motion to vacate, explaining its reasoning in a thorough and thoughtful decision. *Mobil Cerro Negro*, 87 F. Supp. 3d 573.

The District Court briefly addressed Venezuela's argument that the Motion Term Part I Court lacked subject matter jurisdiction over a recognition action. The court concluded that two exceptions to immunity in the FSIA, the waiver and arbitration

---

[13] *See* Southern District of New York Rules for the Division of Business Among District Judges, Rule 3(a), *available at* http://www.nysd.uscourts.gov/rules/rules.pdf.

25

exceptions to immunity, confer subject matter jurisdiction over actions arising out of ICSID awards, citing this Court's decision in *Blue Ridge Investments*, 735 F.3d at 83-84, in support of this conclusion. *Mobil Cerro Negro*, 87 F. Supp. 3d at 588. The court also noted a third potential basis for subject matter jurisdiction: the opening clause of the FSIA's grant of sovereign immunity, which declares foreign sovereigns "immune from the jurisdiction" of federal and state courts except as provided in Sections 1605 to 1607 and "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of [the FSIA]." *Id.* (quoting 28 U.S.C. § 1604). The court suggested that the ICSID Convention might be such an agreement.

The District Court dedicated the remainder of its opinion to addressing two arguments it characterized as "procedural": Venezuela's argument that Section 1650a does not authorize "borrowing" New York's *ex parte* procedures and that, even if Section 1650a once authorized such procedures, the FSIA supersedes it when an action is brought against a foreign sovereign and "imposes service-of-process, personal jurisdiction, and venue requirements not met here." *Id*. at 577.

The District Court first examined whether the *ex parte* procedures were authorized by the ICSID Convention and Section 1650a. Looking to the text of the Convention and Section 1650a, the court concluded that neither the Convention nor the statute specifies "the procedural mechanism by which an arbitral award is to be

converted into a federal judgment." *Id.* at 579. From the statute's silence in this respect, the court identified a "gap" in Section 1650a regarding *how* federal courts are expected to "enforce" ICSID awards—that is, how to convert them into enforceable federal judgments. After noting the Southern District decisions that previously addressed applications to enforce ICSID awards and offering its own examination of Section 1650a, the court ruled that the gap could be filled by reference to state law, specifically New York's CPLR Article 54.

Importing these provisions into Section 1650a, the District Court concluded that it could enter the requested judgment against Venezuela *ex parte*, without requiring Mobil to comply with the procedural prerequisites to suits against foreign sovereigns imposed by the FSIA. The court reasoned that to apply the procedural requirements of the later-enacted FSIA would unacceptably run afoul of the expectations of streamlined procedures reflected in the ICSID Convention and implicit in Section 1650a; it therefore dispensed with them in favor of the summary New York procedures. *Id.* at 599. It further found that its exercise of personal jurisdiction over Venezuela—if personal jurisdiction was needed[14]—was consented to because, by becoming a contracting party to the ICSID Convention, Venezuela "'must have contemplated enforcement actions in

---

[14] The District Court observed that under N.Y. CPLR Article 54, a New York court need not have personal jurisdiction over the judgment debtor covered by the statute to enter a valid judgment. It therefore did not need personal jurisdiction over Venezuela to enter a valid judgment under Article 54. *Mobil Cerro Negro*, 87 F. Supp. 3d at 602 n.36.

27

other [Contracting] States,' including the United States," and therefore had waived any objections to personal jurisdiction. *Id.* at 602 n.36 (quoting *Blue Ridge Invs.*, 735 F.3d at 83-84) (alterations in original). For these reasons, the District Court rejected Venezuela's claim that "the FSIA *sub silentio* amended [Section 1650a]," and held that the *ex parte* procedures utilized in the present case were authorized by Section 1650a. *Id.* at 602.

The District Court therefore denied Venezuela's motion to vacate the judgment. The court acknowledged at the same time that, after Venezuela moved to vacate the judgment, it also applied to ICSID for an annulment of the Award. The ICSID Secretary-General stayed enforcement of the award pending determination of the annulment request, and the District Court likewise stayed enforcement of the award pending ICSID's resolution of Venezuela's request. *See Venezuela Holdings, B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on the Stay of the Enforcement of the Award, ¶ 10 (Sept. 17, 2015); Opinion & Order, *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, No. 1:14-cv-8163 (S.D.N.Y. Feb. 13, 2015), ECF No. 37.

In a separate motion, Venezuela asked the District Court to "clarify" the interest rate imposed by the *ex parte* judgment, which had incorporated the 3.25% post-judgment interest rate provided for by the Award. *Mobil Cerro Negro*, No. 1:14-cv-8163, ECF Nos. 38-40 (S.D.N.Y. Feb. 13, 2015). The court denied the motion, concluding that

28

any change to the post-judgment interest rate would constitute a substantive revision to the Award and that such revisions are contrary to the ICSID Convention and Section 1650a.

### D. *The present appeal*

Venezuela timely appealed the District Court's denial of its motion to vacate the *ex parte* judgment and its motion to adjust the interest rate applicable to the Award. On appeal, Venezuela argues that the District Court erred in not requiring Mobil to bring a plenary action before entering judgment on the Award; that the District Court lacked subject matter jurisdiction and personal jurisdiction over Venezuela under the FSIA; and that the federal interest rate on judgments established by 28 U.S.C. § 1961 governs the Award, not the rate set by the ICSID panel and adopted by the District Court. Mobil, in contrast, maintains that federal courts may use forum state procedures to enter federal judgments against foreign sovereigns on ICSID awards and that summary proceedings are adequate. It submits that the District Court had subject matter jurisdiction over its enforcement action under both Section 1650a and the FSIA, and did not need personal jurisdiction over Venezuela to enforce the Award. Finally, it argues that the District Court was not at liberty to alter the interest rate imposed by the ICSID panel.

29

This Court, after hearing oral argument from the parties, requested the views of the United States through the Office of Legal Adviser at the Department of State, on three issues: (1) whether 22 U.S.C. § 1650a provides a basis for subject matter jurisdiction over an award enforcement action against a foreign sovereign, or whether the FSIA establishes the sole source of jurisdiction over such actions; (2) the lawfulness of a federal court's resort to state procedures allowing an *ex parte* entry of judgment on an ICSID award against a foreign sovereign; and (3) the federal court's authority to modify an interest rate imposed by an ICSID tribunal.

In response, in March 2016, the United States joined Venezuela in taking the position that the FSIA provides the sole source of subject matter jurisdiction over an action to enforce an ICSID award against a foreign sovereign and that the FSIA's procedural rules must be followed in such proceedings. *See* United States Br. as *Amicus Curiae* ("U.S. Br."), *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, No. 15-707 (2d Cir. Mar. 30, 2016), ECF No. 87. It submitted that the District Court's use of New York's *ex parte* procedures to enter a federal judgment on the Award was improper under the FSIA; it agreed with Mobil, however, that the District Court was correct to decline to amend the interest rate included in the Award.

During the pendency of this appeal, an ICSID *ad hoc* Committee annulled a large portion of the original $1.6 billion Award. *See Venezuela Holdings, B.V.*, ICSID Case No.

30

ARB/07/27, Decision on Annulment, ¶ 196 (Mar. 9, 2017); Letter pursuant to Fed. R. App. P. 28(j) on behalf of Appellant Bolivarian Republic of Venezuela ("Venezuela 28(j) Letter"), *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, No. 15-707 (2d Cir. Mar. 22, 2017), ECF No. 102. The Committee concluded that the original panel failed adequately to consider the compensation provisions contained in one of the Venezuela-Mobil agreements (the Cerro Negro Association Agreement) and the Venezuelan legislation approving the project (the Cerro Negro Congressional Authorization). As modified by this decision, the Award now gives Mobil compensation totaling $188,342,482, "a fraction of the original award of $1,600,042,482," Venezuela 28(j) Letter at 2, but nonetheless a substantial sum.

**DISCUSSION**

Rule 60(b) of the Federal Rules of Civil Procedure provides an avenue to relief from a final judgment when the judgment is "void." Fed. R. Civ. P. 60(b)(4). A judgment is void for purposes of the Rule if the court entering judgment lacked subject matter or personal jurisdiction over the judgment debtor. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 138 (2d Cir. 2011). We review *de novo* a district court's denial of a Rule 60(b)(4) motion. *Id.*

This appeal requires us to reconcile the ICSID Convention and Section 1650a with the FSIA, so that we may determine the appropriate procedures for converting an

31

ICSID award into a federal judgment. The parties in this appeal each advocate for one of the two approaches adopted by the district courts.

Mobil supports the approach adopted by district courts in the Southern District and applied by the District Court here. Mobil argues that federal courts may enter judgment on ICSID awards summarily, according to the procedures used in the state courts of the forum state—here, on an *ex parte* petition by the award-creditor. Mobil contends, and the District Court ruled, that this approach best accords with the provisions of the ICSID Convention precluding award-debtors from raising substantive challenges to the award in domestic courts.

Venezuela and the United States as *amicus curiae*, in contrast, endorse the approach adopted by district courts in the District of Columbia and in the Eastern District of Virginia. Venezuela and the United States would require that award-creditors file a complaint seeking entry of judgment on the award; serve the complaint on the foreign sovereign award-debtor; and comply with the venue requirements of the FSIA, with these three steps conferring jurisdiction over the foreign sovereign in the federal district court and permitting that court to enter a valid judgment. This procedure would not necessarily permit a substantive challenge to a duly authenticated award, but it would allow the defendant sovereign to appear and be heard before entry of judgment.

Resolution of this dispute requires us to answer whether Section 1650a provides an independent source of jurisdiction over a foreign sovereign award-debtor or whether the later-enacted FSIA offers the sole basis for federal courts' jurisdiction over foreign sovereigns. It also requires us to consider whether, even if the FSIA provides the sole source of jurisdiction over foreign sovereigns, Section 1650a empowers courts asked to enforce ICSID awards to modify the FSIA's procedural requirements and adopt state court summary procedures for enforcing judgments in each state in which enforcement is sought.

For the reasons set forth below, we agree with Venezuela and the United States as *amicus curiae* that the FSIA controls actions to enforce ICSID awards. We conclude that the FSIA provides the sole source of jurisdiction—subject matter and personal—for federal courts over actions brought to enforce ICSID awards against foreign sovereigns; that the FSIA's service and venue requirements must be satisfied before federal district courts may enter judgment on such awards; and that Section 1650a does not contemplate "recognition" of an ICSID award as a proceeding separate from "enforcement." Although the FSIA provides subject matter jurisdiction over this proceeding, the FSIA's service and venue requirements have not been satisfied here. Accordingly, the District Court lacked personal jurisdiction over Venezuela. The

33

District Court's Rule 60(b) order must therefore be reversed and its judgment must be vacated.

### I. Subject matter jurisdiction

Mobil argues that Section 1650a provides its own independent grant of subject matter jurisdiction when it states that an ICSID award "shall create a right arising under a treaty of the United States" and provides federal district courts with "exclusive jurisdiction" over such action. Appellees' Br. at 40 (quoting 22 U.S.C. § 1650a(a)-(b)) (emphasis omitted). Mobil further argues that ICSID enforcement actions are exempted from the requirements of the later-enacted FSIA by the reservation in FSIA Section 1604 that its provisions were adopted "[s]ubject to existing international agreements to which the United States is a party." *Id.* at 41-42 (quoting 28 U.S.C. § 1604) (emphasis omitted).

Venezuela does not contest that Section 1650a could serve as a grant of subject matter jurisdiction over some actions to enforce ICSID awards; rather, it argues that Section 1650a cannot confer subject matter jurisdiction on federal courts when the ICSID award-debtor is a foreign sovereign. In such a case, it urges us to conclude, the FSIA takes precedence. The ICSID Convention is not, it argues, one of the "existing international agreements" exempted from the FSIA's operation. 28 U.S.C. § 1604.

The District Court found that, if the FSIA applied to this case, subject matter jurisdiction could arise from two exceptions to sovereign immunity found in the FSIA: the implied waiver exception and the arbitration exception, which we have discussed above. *See* 28 U.S.C. §§ 1605(a)(1), (6). On this point, we are in accord with the District Court. Indeed, our Court recently held as much in *Blue Ridge Investments*, 735 F.3d 72. We disagree, however, with Mobil's assertion that Section 1650a also provides a grant of subject matter jurisdiction to the federal courts over award enforcement actions against foreign sovereign award-debtors, and that the FSIA did not abrogate that grant (if ever Section 1650a embodied such a grant). We reject this argument primarily for two reasons.

First, the Supreme Court's decision in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), suggests that, even if Section 1650a once granted subject matter jurisdiction, after passage of the FSIA, Section 1650a cannot fairly be read to serve as an independent source of subject matter jurisdiction over a foreign sovereign. The Supreme Court's emphatic and oft-repeated declaration in *Amerada Hess* that the FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts," *id.* at 434; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (quoting *Amerada Hess*, 488 U.S. at 434-35); *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (same), is difficult to reconcile with an approach that preserves the potential of Section 1650a to

35

serve as an alternative. Recently, the Supreme Court emphasized that the FSIA is "comprehensive"—a term the Court has used "often and advisedly to describe the Act's sweep"—meaning that "after the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *NML Capital, Ltd.*, 134 S. Ct. at 2255-56 (alterations and citation omitted). We have similarly reiterated our understanding of the categorical nature of this declaration in *Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 830 F.3d 107, 122 (2d Cir. 2016) ("The FSIA provides the exclusive basis for obtaining subject matter jurisdiction over a foreign state."), and *Blue Ridge Investments*, 735 F.3d at 83 ("The only source of subject matter jurisdiction over a foreign sovereign or its instrumentalities in the courts of the United States is the FSIA . . . ."). The comprehensiveness of the FSIA's framework suggests that Section 1650a should not be read as providing an independent basis for courts to exercise subject matter jurisdiction over foreign sovereigns, or, at the very least, should no longer be read as providing such a basis, even if it once did.

Second, although the question is not free from doubt, we are not persuaded by Mobil's argument that FSIA Section 1604's carve-out for "existing international agreements" includes the Convention. In *Amerada Hess*, the Supreme Court explained that international agreements that predate the FSIA are excluded from the Act's reach

36

only when they expressly conflict with the Act's immunity provisions. *See* 488 U.S. at 442 (explaining that Section 1604's carve-out "applies when international agreements *expressly conflict* with the *immunity* provisions of the FSIA" (emphasis added) (alterations and citation omitted)); *see also* H.R. Rep. No. 94-1487, at 6616 ("In the event an international agreement *expressly conflicts* with [the FSIA], the international agreement would control. . . . [But] the international agreement would control *only where a conflict was manifest*." (emphases added)). Because actions to enforce ICSID awards rendered against foreign sovereigns fall neatly into the FSIA's specific exemptions from immunity under Sections 1605(a)(1) (waiver) and (6) (arbitration), *see Blue Ridge Invs.*, 735 F.3d at 83-86, we see no conflict between the FSIA's immunity provisions and the ICSID Convention or Section 1650a that would trigger Section 1604's carve-out as construed by the Supreme Court.

Section 1650a's legislative history also undermines the argument that FSIA Section 1604 exempts the ICSID Convention and Section 1650a from the FSIA's jurisdictional provisions. The legislative record strongly suggests that, when Congress enacted Section 1650a in 1966, a decade before it passed the FSIA, it contemplated that actions against foreign sovereigns under Section 1650a would remain subject to sovereign immunity. Thus, during his appearance before the House Committee on Foreign Affairs, Deputy Legal Adviser at the Department of State Andreas Lowenfeld

37

testified tellingly: "Basically what this convention says is that the district court shall have jurisdiction over the subject matter. As to whether it has jurisdiction over a party, there is nothing in the convention that will change the defense of sovereign immunity." H.R. 15785 Hearing, at 18 (statement of Andreas F. Lowenfeld, Deputy Legal Advisor, Dep't of State). He elaborated that if, for example, "someone wants to sue Jersey Standard in the United States, on an award, no problem. If somebody wants to sue Peru or the Peruvian Oil Institute, why it would depend on whether in the particular case that entity would or would not be entitled to sovereign immunity." *Id*. (paragraph break omitted).

His testimony is consonant with the venerable canon of construction that Congress is presumed to legislate with familiarity of the legal backdrop for its legislation. *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."). We are aware of no contrary textual or record indication that Congress intended to exclude proceedings brought under Section 1650a from the ordinary operation of sovereign immunity, either as the principle of immunity stood before or after the enactment of the FSIA.[15]

---

[15] The District Court pointed to the New York Convention and the contrast that it perceived

38

The Supreme Court's consideration of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, in *Amerada Hess* is also instructive. There, the Court rejected the argument that the ATS—which, like Section 1650a, predates the FSIA—continued to confer subject matter jurisdiction over a foreign sovereign after the FSIA's enactment. *Amerada Hess*, 488 U.S. at 436-38. To the extent the ATS ever provided a source of subject matter jurisdiction over foreign sovereigns, the *Amerada Hess* Court found it could no longer confer that authority after the passage of the FSIA, nor did Congress's failure to repeal the ATS when it enacted the FSIA counsel otherwise. *Id*. at 437. The Court viewed as particularly significant in this regard the fact that the ATS "does not distinguish among classes of defendants," and could therefore continue to have "the same effect after the passage of the FSIA as before with respect to defendants *other than foreign states*." *Id*. at 438 (emphasis added). In other words, any conferral of subject matter jurisdiction stemming from the ATS would be unaffected as to non-sovereign defendants, but the ATS could not confer subject matter jurisdiction over foreign sovereigns after passage of the FSIA.

The same is true here. Section 1650a does not "distinguish" among classes of private defendants: it states broadly that "[t]he district courts of the United States . . .

Congress wished to draw between that Convention's enforcement mechanisms, set out in Chapter 2 of the Federal Arbitration Act, and the simpler mechanism desired for ICSID. *Mobil Cerro Negro*, 87 F. Supp. 3d at 593-97. The point is sound, but it does not lead inexorably to the conclusion that state summary procedures are what Congress intended to authorize or require in Section 1650a.

39

shall have exclusive jurisdiction over actions and proceedings" to enforce ICSID awards. 22 U.S.C. § 1650a(b). Section 1650a's grant of subject matter jurisdiction over private defendants may remain intact[16]; but, after passage of the FSIA, Section 1650a no longer confers subject matter jurisdiction over foreign sovereigns. The ATS and Section 1650a, of course, enacted two centuries apart and addressing very different concerns, have scant overlap in most respects. Nonetheless, the Supreme Court's reasoning about the interrelationship of the FSIA and the ATS as set forth in *Amerada Hess* provides a useful template for interpreting the FSIA's comprehensive framework for sovereign immunity in the ICSID award context.

Combined with the legislative history that suggests that Congress expected actions under Section 1650a to be governed by sovereign immunity, *Amerada Hess* in its holding as well as in its language confirms our decision that Section 1650a does not constitute an independent grant of subject matter jurisdiction over a foreign sovereign. The FSIA provides the sole basis for subject matter jurisdiction over actions in federal court to enter judgment against foreign sovereigns on ICSID awards.

---

[16] We offer no view about the status of Section 1650a as a jurisdictional basis for actions brought by an ICSID award-creditor against a non-sovereign award-debtor.

## II. Personal jurisdiction

### A. *Scope of the FSIA*

Having concluded that the FSIA provides the sole basis for subject matter jurisdiction in cases brought to enforce ICSID awards, we must now determine whether the FSIA also controls the procedures by which such actions must be brought against a foreign sovereign award-debtor. We conclude that it does.

At Mobil's urging, the District Court concluded that the FSIA's service and venue requirements had no bearing on Mobil's application for enforcement. The court first observed that the FSIA "leaves congressional intent unclear" regarding whether its service of process and venue requirements apply in the ICSID award context. *Mobil Cerro Negro*, 87 F. Supp. 3d at 593. Having identified this ambiguity, the court then turned to its own interpretation of the "objectives of the ICSID Convention and of Congress" in passing Section 1650a to determine whether the summary procedures invoked by Mobil would be appropriate. *Id*. at 599.

We find no such ambiguity in the FSIA's text. As the Supreme Court has advised, "[a]lthough a major function of the [FSIA] . . . is to regulate jurisdiction of federal courts over cases involving foreign states, the Act's purpose is to set forth comprehensive rules governing sovereign immunity," including "procedures for commencing lawsuits against foreign states." *Verlinden*, 461 U.S. at 495 n.22 (internal quotation marks and citation omitted); *see also* H.R. Rep. No. 94-1487, at 6606 ("[T]his bill would for the first

41

time in U.S. law, provide a statutory procedure for making service upon, and obtaining in personam jurisdiction over, a foreign state . . . ."). The Act was intended to "provide when and how parties can maintain a lawsuit against a foreign state." H.R. Rep. No. 94-1487, at 6604. The FSIA prescribes comprehensive procedures for bringing suit against foreign sovereigns, including suit for "recognition and enforcement of arbitral awards," 28 U.S.C. § 1605(a)(6), as to which the foreign state may be found to have waived the immunity otherwise conferred. Thus it is not Section 1650a's silence on enforcement of ICSID awards that guides our reasoning. Rather, we accord conclusive weight to the affirmative and sweeping provisions in the FSIA's comprehensive statutory scheme and the observation that the FSIA makes no provision for summary procedures in any instance.

In fact, the FSIA explicitly contemplates the exercise of federal court jurisdiction over actions to enforce international arbitral awards against foreign sovereigns under the exemption from immunity provided by Section 1605(a)(6). And nowhere in the FSIA did Congress expressly exempt actions against foreign sovereigns under Section 1605(a)(6) from the statute's service or venue requirements. *See* 28 U.S.C §§ 1391(f), 1608. Indeed, nowhere in the FSIA did Congress provide an expedited procedure to enter a federal judgment against a foreign sovereign in *any* circumstance. *Cf.* H.R. Rep. No. 94-1487, at 6612 (noting "sections 1330(b) [personal jurisdiction

42

provision], 1608 [service of process provision], and 1605-1607 [foreign sovereign immunity provisions] are all carefully interconnected"). We simply see no reason to conclude that an action to enforce an ICSID award, which is comfortably encompassed within Section 1605(a)(6), would be exempt from the FSIA's procedural requirements.

**B.      *Conflict with the ICSID Convention or Section 1650a***

The District Court rejected this straightforward application of the FSIA's service and venue provisions, in part, based on its concern that requiring compliance with these provisions of the FSIA "would bring the FSIA into grave tension with the objectives of the ICSID Convention and of Congress." *Mobil Cerro Negro*, 87 F. Supp. 3d at 599. It thus endorsed instead the adoption of New York state procedures, which it viewed as more consistent "Congress's expectation" that ICSID award recognition "would be automatic and not subject to contest." *Id.* at 600.

At the outset, we note that, in interpreting the ICSID Convention and its enabling act, we owe particular deference to the interpretation favored by the United States. *Medellín v. Texas*, 552 U.S. 491, 513 (2008) ("It is . . . well settled that the United States' interpretation of a treaty is entitled to great weight." (internal quotation marks and citation omitted)). In its brief *amicus curiae*, the United States articulates its view that "the mechanics of enforcing ICSID awards are not and never were governed by treaty," U.S. Br. at 13, and that neither the Convention nor Section 1650a "requires or forbids

43

any particular set of procedures," *id.* at 16. Instead, the ICSID Convention "reserves the means of enforcement to member states, which enforce awards in the same way that they enforce domestic judgments." *Id.* at 13.

We agree with the United States that the FSIA's requirements and the United States' obligations under the ICSID Convention do not stand in significant tension. As we have noted, the ICSID Convention contemplates treatment of an award "as if it were a final judgment of the courts of a constituent state." ICSID Convention art. 54. Article 54 affords ICSID arbitral awards the status of final state court judgments, and was included in the Convention at the insistence of the United States. *See* Schreuer, *Commentary*, at 1143. It does not, however, dictate the nature of the proceedings through which ICSID awards will be enforced in the United States.

The United States was faithful to this provision when it enacted Section 1650a, requiring the federal courts to accord ICSID awards "full faith and credit as if the award were a final judgment of . . . one of the several States." 22 U.S.C. § 1650a(a). The legislative history suggests that this provision was intended to immunize ICSID awards from substantive assault outside the ICSID tribunal. *See, e.g.,* Smith House Statement at 4 ("[A]n action would have to be brought on the award in a U.S. district court . . . . In such an enforcement action, the district court would be required to give full faith and credit to the arbitral award. Essentially, this means that district courts would be

44

precluded from inquiring into the merits of the underlying controversy."). Requiring an enforcement action to comply with the FSIA does not contravene this mandate.

To require that a civil action be prosecuted to conclusion before entering judgment on an ICSID award will not relieve federal courts of the responsibility under the Convention and Section 1650a to enforce ICSID awards as final. *See* ICSID Convention art. 53(1) (providing that ICSID awards "shall not be subject to any appeal or to any other remedy except those provided for in [the] Convention"); 22 U.S.C. § 1650a(a) (providing that "pecuniary obligations imposed by [ ] an award . . . shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States"); *see also* Schreuer, *Commentary*, at 1139-41.

Litigation on actions to enforce awards need not be protracted. That the action might be referred to as "plenary" as opposed to "summary" does not portend a proceeding in which the court must entertain all manner of substantive defenses, or even defenses cognizable under the Federal Arbitration Act. Used in this context, the word "plenary" signals merely the need for commencing an action under Federal Rule of Civil Procedure 3, service of the complaint in compliance with Rule 4 (as modified by the FSIA), and the opportunity for the defendant sovereign to appear and file responsive pleadings. To initiate such an action, an ICSID award-creditor may file a

complaint in district court, detailing the terms of the award, establishing proper venue, and furnishing a certified copy of the award. After the complaint is filed and service effected, the award-creditor may file a motion for judgment on the pleadings, for instance, or a motion for summary judgment. The ICSID award-debtor would be a party to the action and would be able to challenge the United States court's jurisdiction to enforce the award—for instance, on venue grounds—but would not be permitted to make substantive challenges to the award.

Moreover, requiring compliance with the FSIA facilitates an enforcement regime for ICSID awards that has a greater prospect of consistency across the nation. The District Court discounted any need for uniformity of enforcement in the ICSID context, observing that each member state to the Convention will enforce awards according to different procedures. But in so reasoning, the District Court overlooked the Congressional intent, manifest in the enabling legislation's history and text, to provide for uniform enforcement *within* the United States. Congress vested exclusive jurisdiction over enforcement of ICSID awards in the federal courts. *See* 28 U.S.C. § 1650a(b). Testimony given by the General Counsel of the Treasury before the Senate Committee on Foreign Relations reflects that in enacting Section 1650a, Congress was guided by a desire to provide a uniform enforcement procedure throughout the United States:

> [T]he proposed legislation states that district courts of the United States shall have exclusive jurisdiction over actions to enforce arbitral awards. This provision is also based on article 54(1) of the convention, which states that . . . arbitral awards may be enforced in or through the Federal courts. The United States suggested this provision in order to be able to provide in the United States for a *uniform procedure* for enforcement of awards rendered pursuant to the convention.

S. Rep. No. 89-1374, at 17 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2617, 2619 (emphasis added). Calling upon different state procedures in each of the states in which district courts sit at the entry-of-judgment phase would actively undermine the goal of establishing a nationally uniform procedure for enforcement of ICSID awards. Indeed, such a regime could be expected to achieve the opposite result, in which each state could potentially require a distinct procedure.[17] Applying the FSIA will facilitate national uniformity in procedure. Consistency as to enforcement seems to us importantly aligned with the values of predictability and federal control that foreign affairs demands and that the FSIA was designed to promote.

We are confident that our decision that actions to enforce ICSID awards against foreign sovereigns must comply with the FSIA's service and venue provisions is consistent with the United States' obligations under the ICSID Convention.

---

[17] We recognize, of course, that executions on the judgment will proceed according to state law. *See* Fed. R. Civ. P. 69(a)(1). But this does not compel us to abandon the goal of consistency when the award is first converted to a federal judgment.

### C. *"Recognition" under Section 1650a*

The District Court's contrary reasoning also derived from the notion that "recognition," and not just "enforcement," was part of the District Court's task. The District Court viewed recognition, like confirmation in the context of other arbitral proceedings, as a mere ministerial act preliminary to enforcement.[18] Other courts have

---

[18] We note the variability in usage of the words "confirmation," "recognition," and "enforcement," in the context of treatment of an arbitral award. Our Court has recently reviewed that usage in some depth. *See CBF Indústria De Gusa S/A v. Amci Holdings, Inc.*, 850 F.3d 58, 72 n.5 (2d Cir. 2017) (discussing terms in context of New York Convention and Federal Arbitration Act).

"Confirmation" appears to have developed a particular meaning in the context of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, including those of its provisions that enable the New York Convention (governing judicial treatment of certain foreign arbitral awards), *see id.* § 201 *et seq.* In FAA practice, an order "confirming" an arbitral award must be issued upon timely application of any party to the arbitration and upon prior notice served upon the adverse party unless the award is vacated, modified, or corrected as provided for by the Act. *Id.* §§ 9-11, 207. Judgment entered on the basis of an order confirming the award has "the same force and effect, in all respects, as, and [is] subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." *Id.* § 13. We explained in *CBF Indústria* that "confirmation," as used in the FAA sections enabling the New York Convention, "is the equivalent of 'recognition and enforcement' as used in the New York Convention for the purposes of foreign arbitral awards." 850 F.3d at 72. No separate proceeding is required to "confirm" a foreign arbitral award under the New York Convention; an award-creditor need file only a single action to enforce the foreign New York Convention award under the FAA. *Id.* at 74.

"Recognition" and "enforcement" thus appear to have taken on the basic meaning (in the foreign arbitral context) of converting the judgment of another jurisdiction into a federal judgment on which execution (attachment, imposition of a lien, garnishment) may occur. *See* Fed. R. Civ. P. 69(a)(1) ("A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."). We think it significant that, unlike the FAA, the ICSID Convention and Section 1650a do not refer to judicial "confirmation."

48

rested their reasoning about their obligations with respect to ICSID awards in part on this distinction. *See, e.g.*, *Micula II*, 2015 WL 4643180, at *3-4.

As noted above, Article 54 of the Convention requires member states to "*recognize* an award rendered pursuant to this Convention as binding and *enforce* the pecuniary obligations imposed by that award." ICSID Convention art. 54 (1)-(2) (emphasis added). In this, the Convention seems to refer to "recognition" and "enforcement" as if they were distinct actions. *See* Schreuer, *Commentary*, at 1128 (describing "recognition" as "the formal confirmation that the award is authentic and that it has the legal consequences provided by the law" and noting that it may be "a step preliminary to enforcement").

But the Convention is not self-executing. *See Medellín*, 552 U.S. at 505-06 & n.3 (treaties not specified as self-executing can be enforced only pursuant to implementing legislation); *id.* at 533-34 & n.1 (Stevens, J., concurring) (citing Section 1650a as an example). We must therefore focus in the first instance on the terms of the ICSID enabling act, Section 1650a, to determine the scope of a federal court's authority with respect to awards under the Convention, and refer to the Convention only for aid in construing Section 1650a where needed.

In contrast to the Convention, Section 1650a(a) refers to enforcement, but not to recognition: it directs only that "[t]he pecuniary obligations imposed by such an award

49

shall be *enforced* and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a) (emphasis added). It makes no mention of recognition as a separate, additional judicial action, and we think that its framing was intentional.

Other language from Section 1650a confirms this conclusion. Section 1650a(b) grants federal courts "exclusive jurisdiction over *actions* and *proceedings* under subsection (a)." *Id.* § 1650a(b) (emphasis added). The terms "actions" and "proceedings" typically connote something more than a summary *ex parte* conference leading to entry of a judgment on an award: after all, those terms are the foundation of the Federal Rules of Civil Procedure. Rule 1 provides, for example, "These rules govern the procedure in all civil actions and proceedings in the United States district courts," subject to a few exceptions not relevant here.[19] Fed. R. Civ. P. 1. In similar vein, Rule 2 provides, "There is one form of action—the civil action." Fed. R. Civ. P. 2; *see also* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). Accordingly, we understand these terms to contemplate enforcement obtained through a civil action on the award. *See Micula I,* 104 F. Supp. 3d at 50 ("The use of the words 'actions' and

---

[19] Rule 81 exempts certain listed proceedings, such as prize proceedings in admiralty, Fed. R. Civ. P. 81(a)(1), and "other procedures" provided for by Title 9 of the United States Code, Fed. R. Civ. P. 81(a)(6)(B). Title 9 governs federal arbitration, but under Section 1650a, it does not apply to ICSID arbitration awards. 22 U.S.C. § 1650a(a).

'proceedings' strongly connotes a congressional intent to domesticate ICSID awards through a plenary action, rather than ex parte confirmation or recognition.").

Further, Section 1650a directs that "[t]he Federal Arbitration Act . . . shall not apply to enforcement of awards rendered pursuant to the [ICSID Convention]." 22 U.S.C. § 1650a(a). This exemption carries two resonances of import here. First, the FAA specifically provides for confirmation of domestic arbitral awards by *court order*, not through an "action" or "proceeding." 9 U.S.C. § 9 ("[A]t any time within one year after the award is made any party to the arbitration may apply . . . for an *order confirming* the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed [elsewhere in] this title." (emphasis added)). That Congress so provided many years earlier suggests that, although it knew how to provide for summary procedures in the arbitral context, it simply elected not to do so in Section 1650a.[20] *See Micula I*, 104 F. Supp. 3d at 50 ("Congress was keenly aware that domestic arbitration awards could be confirmed, but elected not to use that procedure

---

[20] In a hearing conducted by the House of Representatives Subcommittee on International Organizations and Movements on the bill that would become Section 1650a, the General Counsel of the Treasury, Fred Smith, testified that the FAA exclusion appearing in Section 1650a(b) was meant to convey that enforcement of ICSID awards could be pursued in "the courts of a contracting state regardless of whether judicial enforcement was specifically provided for in the agreement [to arbitrate]." Smith House Statement at 4-5. This was presented as contrasting with the FAA, which allows confirmation of an award only by a court "specified in the agreement of the parties." *See* 9 U.S.C. § 9. Smith also testified that the FAA's exclusion was meant to insulate ICSID awards from substantive attack such as those recognized as valid by the FAA. Smith House Statement at 4-5. These statements reflect awareness of and a deliberate decision not to adopt the FAA's summary procedures.

for ICSID awards.").

Second, the FAA prescribes grounds for vacating an arbitral award where the award was tainted by, among other things, fraud, corruption, or misconduct by the arbitrator. *See* 9 U.S.C. § 10. By expressly precluding the FAA's application to enforcement of ICSID Convention awards, Congress intended to make these grounds of attack unavailable to ICSID award-debtors in federal court enforcement proceedings. *See* 112 Cong. Rec. 13148, 13149 (daily ed. June 15, 1966) (written statement of Sen. Fulbright) (conveying that substantive attack to ICSID awards on grounds provided by FAA can be made "only through the annulment proceedings provided for in the Convention," not in federal court). Congress's exclusion of the FAA's provisions from Section 1650a may suggest an expectation that actions to enforce ICSID awards would not be protracted, as emphasized by the District Court. But the exclusion of the substantive attacks available under the FAA from ICSID award actions does not, in our judgment, imply an intention that a foreign sovereign award-debtor be denied notice of the action to enforce the award and the occasion to make non-merits challenges to the award: for example, to question the authenticity of the award presented for enforcement, the finality of the award, or the possibility that an offset might apply to the award that would make execution in the full amount improper. If the debtor were not entitled to notice of an enforcement attempt, it would have no opportunity to level

such attacks before the award became a federal judgment. Nor would remitting these challenges to the execution stage, which often would occur piecemeal and in various jurisdictions, be adequate, efficient, or in keeping with the general background of sovereign immunity law in the United States.

Our reading of Section 1650a thus suggests that Congress did not contemplate federal court "recognition" of ICSID awards; it contemplated only enforcement. And enforcement should proceed, the statute directs, "as if the award were a final judgment of a [state court]" for which enforcement were sought in federal court and which is owed full faith and credit. 22 U.S.C. § 1650a. Accordingly, we turn briefly to what it means to "enforce" a state court judgment in federal court and award it full faith and credit.[21]

---

[21] In reading the text of Section 1650a, Mobil urges us to apply the rule of construction known as the "last-antecedent" rule. *See Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 576 (2d Cir. 2016) (citing *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016)). Under that rule, in a list of items that includes a limiting phrase at the end, the preferred reading applies the limitation only to the last item on the list and not to every item on the list. Thus, here the statute provides that "[t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit *as if* the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a (emphasis added). Mobil urges that the phrase "as if the award were a final judgment . . . of one of the several States" should be read to modify the phrase "full faith and credit" and not the phrase "shall be enforced." We are not convinced that applying that rule would make a dispositive difference here. But in any event, for reasons set forth in the text, we think the better reading gives more weight to the final phrase: that is, that federal courts are directed *both* to "enforce[]" ICSID awards "as if they were a final judgment of one of the several States" *and* to give such awards "full faith and credit"— that is, *res judicata* effect. The last-antecedent rule is hardly a statutory mandate, in any event, and in this context, where the analogy to honoring judgments of constituent states of federal member states was sought by the United States in particular, the reading we adopt seems to us a

## D. *"Full faith and credit" under Section 1650a*

Section 1650a requires federal courts to "enforce" ICSID awards and accord them "the same full faith and credit as if [they] were [ ] final judgment[s] of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). To identify the type of action necessary to enforce ICSID awards in compliance with Section 1650a, we look to established procedures for enforcing state court judgments in federal court.

Since 1948, federal courts have been directed by 28 U.S.C. § 1738 to accord state court judgments full faith and credit. *See* Pub. L. No. 80-773, 62 Stat. 869, 947 (1948) (codified at 28 U.S.C. § 1738).[22] Section 1738 does not, however, provide guidance as to how state court judgments may be enforced in federal court. Actions to enforce state court judgments in federal court are rare. *See Siag*, 2009 WL 1834562, at *1 (noting

---

more natural one.

[22] Section 1738 provides:

> The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

54

rarity). They are not unknown, however. *See, e.g.*, *Weininger v. Castro*, 462 F. Supp. 2d 457, 466 (S.D.N.Y. 2006) (action brought in federal court on default judgment previously entered by state court against Republic of Cuba). As the United States' brief *amicus curiae* points out, it was the case in 1966, and remains so today, that federal courts generally require that a civil action be filed, with notice to the judgment creditor, before enforcing a state court judgment. U.S. Br. at 17 n.5 (citing *Midessa Television Co. v. Motion Pictures for Television, Inc.*, 290 F.2d 203, 204 (5th Cir. 1961), *Caruso v. Perlow*, 440 F. Supp. 2d 117, 119 (D. Conn. 2006), and *Continental Cas. Co.*, 893 F. Supp. 2d at 753)); *see also* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4469 (2d ed. 2002) ("The most direct consequence of applying the full faith and credit statute is that a federal court must enforce a state court judgment when an action is brought for that purpose."). In light of this history, it is reasonable to conclude that Congress was aware of this practice when it enacted Section 1650a, and thus would have contemplated that ICSID awards would be enforced in federal court by judgment entered on an action filed—and not on an *ex parte* petition—on an ICSID award.

In further support for this view, we note in contrast that, by statute first enacted in 1948, federal district courts have been empowered summarily to *register* the judgments of *other federal district courts* to permit enforcement in the registering district.

55

*See* Pub. L. 80-773, 62 Stat. 869, 958 (codified at 28 U.S.C. § 1963) ("A judgment in an action for the recovery of money or property entered in any [federal court] may be registered . . . in any other district . . . .")[23]; *Caruso*, 440 F. Supp. 2d at 118 ("[B]y its express terms, § 1963 applies only to registration of federal-court judgments in another federal court."); *but see GE Betz, Inc. v. Zee Co., Inc.*, 718 F.3d 615, 625 (7th Cir. 2013) (utilizing Section 1963 to register state court judgment in federal court, but acknowledging that doing so was out of step with other courts). It is significant that Congress chose not to incorporate the well-established, streamlined, and unitary federal registration procedures of 28 U.S.C. § 1963 into Section 1650a, preferring instead to refer generally to the full faith and credit doctrine and preexisting federal practice for

---

[23] Section 1963, "Registration of judgments for enforcement in other districts," provides in relevant part:

> A judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district or, with respect to the Court of International Trade, in any judicial district, when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown. Such a judgment entered in favor of the United States may be so registered any time after judgment is entered. A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.
>  . . .
> The procedure prescribed under this section is in addition to other procedures provided by law for the enforcement of judgments.

addressing state court judgments as commentary on the obligation to enforce such awards.

An examination of the available legislative history of Section 1650a also tends to confirm our view that Congress did not invite the incorporation of summary enforcement procedures against foreign sovereign award-debtors. During a hearing on the bill proposing what became Section 1650a, Senator Fulbright offered a copy of the proposed legislation and an analysis section that advised:

> To give full faith and credit to an arbitral award as if it were a final judgment of a court of one of the several States means that *an action would have to be brought on the award in a United States District court* just as an action would have to be brought in a United States District court to enforce the final judgment of a State court.

112 Cong. Rec. at 13149 (emphasis added). Senator Fulbright continued that, "[i]n such an enforcement action the United States District court would be required to give full faith and credit to the arbitral award." *Id.* The proximity of his comment on full faith and credit to his remark about the need for an "action" to be brought highlights that full faith and credit, as used in Section 1650a, meant something less than automatic recognition and conversion of the award into a federal judgment, contrary to what Mobil now suggests. Nor was Senator Fulbright's prepared text an offhand comment. The General Counsel of the Treasury testified to the same effect before the House Committee on Foreign Affairs. *See* Smith House Statement at 4 ("[A]n action would

57

have to be brought in a U.S. district court to enforce the final judgment of a State court.").

Based on our reading of Section 1650a, our discussion of the enforcement mechanism traditionally available to federal courts to enforce state court judgments, and our review of Section 1650a's legislative history, we conclude that Section 1650a mandates enforcement of ICSID awards in federal court through an action on the award and not through an *ex parte* order.

Mobil and the District Court rely heavily on our decision in *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987), to reach a contrary conclusion regarding the import of Section 1650a's directive that the Award be enforced like a state court judgment. In doing so, however, Mobil and the District Court rely on an erroneous reading of *Keeton* introduced by the district court in *Siag*. *See* 2009 WL 1834562, at *2-3.

In *Keeton*, a judgment creditor received a judgment in the District of New Hampshire. 815 F.2d at 857. She filed this judgment in the New York Supreme Court using the procedures specified in N.Y. CPLR 5402. *Id.* at 858.The judgment debtor then removed the action to the Southern District and sought to enjoin enforcement of the judgment, arguing, *inter alia*, that the judgment creditor should have applied the procedures for registering judgments of one federal district court in another federal district court, that is, 28 U.S.C. § 1963. *Id.* On appeal, this Court affirmed the propriety

58

of registering the New Hampshire federal judgment in New York state court using N.Y. CPLR Article 54, rather than the procedure offered by Section 1963. *Id.* at 861 (holding that "Article 54 was meant to be available for enforcement of out-of-state federal judgments and sister-state judgments" and that "this clear intention should not be overridden simply because the same result could also be achieved by the two-step procedure offered by section 1963"). *Keeton* thus addressed only the registration in *state* court of a *federal* district court judgment entered in another district.

In *Siag*, the district court concluded that, because Section 1650a requires that ICSID awards be treated "as if the award were a final judgment of a court of general jurisdiction of one of the several states," and *Keeton* "observed" that CPLR Article 54 "provide[s] a vehicle through which the judgment of a 'sister state' could be enforced in New York," judgment could be entered on ICSID awards using the summary procedures provided for in N.Y. CPRL 5402. *Siag*, 2009 WL 1834562, at *1-3. But *Keeton* did not concern a federal court's action on an out-of-district state court judgment. *Siag*'s reliance on *Keeton* was therefore misplaced. *Keeton* addressed a scenario that is the reverse of that presented here: *Keeton* dealt with a *state* court's treatment of a *federal* court judgment, whereas ICSID awards are to be treated by *federal* courts as *state* court judgments. *Siag* is thus unpersuasive, and the procedures adopted by courts in the Southern District relying upon *Siag* should no longer be applied.

Our conclusion that Section 1650a does not support summary registration for converting ICSID awards into federal judgments, but rather requires commencement of an action on the award in federal court, brings Section 1650a into alignment with our interpretation of the FSIA. Following Supreme Court precedent, we have consistently described the FSIA as providing the sole source of subject matter jurisdiction over foreign sovereigns. We continue to do so today.

## CONCLUSION

Section 1650a of Title 22 requires federal courts to enforce ICSID awards as if they were final judgments of state courts—that is, pursuant to civil actions brought under the Federal Rules of Civil Procedure on such awards. The FSIA provides the sole basis for United States courts' subject matter jurisdiction over foreign sovereigns, and Section 1650a embodies no exception to that rule. As a result, when the ICSID award-debtor is a foreign sovereign, the FSIA's procedural mandates control, including the requirements that process be served to obtain personal jurisdiction under 28 U.S.C. § 1330(b), and venue be proper under 28 U.S.C. § 1391(f).

In light of our conclusion that the District Court did not have subject matter jurisdiction under Section 1650a and that the FSIA governs all aspects of this action, it follows further that the District Court's judgment was void: Mobil did not serve Venezuela in accordance with the FSIA, 28 U.S.C. § 1608, and the District Court

60

therefore did not have personal jurisdiction over Venezuela, 28 U.S.C. § 1330(b).

Furthermore, Mobil's *ex parte* petition is devoid of any assertion that venue in the Southern District of New York is appropriate under the FSIA, nor is the propriety of that venue apparent from the face of the petition. We therefore reverse the District Court's order denying Venezuela's Rule 60(b) motion to vacate, and we vacate the judgment against Venezuela without prejudice to Mobil's filing an action to enforce the ICSID award in a court in which venue is permitted under the FSIA. Because we vacate the judgment, we need not consider whether the District Court properly refused to adjust the interest rate imposed by the ICSID tribunal on the Award.

The District Court's order denying Venezuela's motion to vacate is **REVERSED**, the judgment is **VACATED**, and the cause is **REMANDED** with instructions to dismiss the petition without prejudice to renewal in an action commenced in compliance with the Foreign Sovereign Immunities Act.